IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 23-289** |
| **Defendant No. 1: Approximately $5,524,745.33 seized from Morgan Stanley Account in the name of Gulf Coast Molecular Laboratories, LLC, account # xxxx7097;** | |
| **Defendant No. 2: Approximately $2,965,970.85 seized from Renasant Bank in the name of TeleMD, LLC, account # xxxx2094; and** | |
| **Defendant No. 3: Approximately $789,936.10 seized from Community Bank in the name of Gulf Coast Molecular Laboratories, LLC, account # xxxx8834,** | |
| **Defendants.** | |

**VERIFIED COMPLAINT FOR FORFEITURE _IN REM_**

Plaintiff United States of America, by and through the United States Attorney for the

Southern District of Alabama, Sean P. Costello, brings this Verified Complaint and alleges upon

information and belief, in accordance with Supp'l Rule G(2), Supplemental Rules for Admiralty

or Maritime Claims and Asset Forfeiture Actions, as follows:

## NATURE OF THE ACTION

1.      This is a civil action *in rem* to forfeit to the United States of America, pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), 981(a)(1)(D), 982(b)(1), 28 U.S.C. § 2461 and Rule(G)(2) the defendants property identified above and further identified herein, because the defendants property constitute proceeds traceable to violations of 18 U.S.C. §§ 1343, 1347, 1349, 1344,  and were involved in money laundering transactions in violation of 18 U.S.C. §§ 1956, 1956(h) and 1957. The defendants property are thus property constituting "specified unlawful activity" (as defined in section 1956(c)(7) of Title 18) and property involved in money laundering offenses and are therefore subject to civil forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C).

## JURISDICTION AND VENUE

2.      This Court has *in rem* jurisdiction over the defendants pursuant to:

a.      28 U.S.C. §§ 1345 and 1355(b)(1)(A), because pertinent acts or omissions giving rise to the forfeiture occurred in or around Mobile, Alabama, which is in Mobile County, and the Southern District of Alabama; and

b.      28 U.S.C. § 1355(b)(1)(B), because venue properly lies in the Southern District of Alabama pursuant to 28 U.S.C. §  1395.

3.      Venue is proper in the United States District Court for the Southern District of Alabama, pursuant to 28 U.S.C. § 1355(b)(1), because the acts or omissions giving rise to the forfeiture occurred in this district and/or pursuant to 28 U.S.C. § 1395 because the defendants are located within this district.

## THE DEFENDANTS *IN REM*

4.      The defendants are personal property fully described as:

2

a. Defendant No. 1: Approximately $5,524,745.33 seized from Morgan Stanley in the name of Gulf Coast Molecular Laboratories, LLC, C/O Scott McArdle, account # xxxx7097. The records of Morgan Stanley reflect that Scott McArdle opened account #xxxx7097 on June 14, 2023;

b. Defendant No. 2: Approximately $2,965,970.85 seized from Renasant Bank in the name of TeleMD, LLC, account # xxxx2094. The records of Renasant Bank reflect that Brian S. Cotugno opened account # xxxx2094 at Renasant Bank located at 485 Dacula Drive, Dacula, GA 30019 on June 22, 2022; and

c. Defendant No. 3: Approximately $789,936.10 seized from Community Bank in the name of  Gulf Coast Molecular Laboratories, LLC, account # xxxx8834. The records of Community Bank reflect that John Thomas McArdle, Jr. and James Matthew Thornton Potter opened account # xxxx8834 at Community Bank located at 6587 Airport Boulevard, Mobile, Alabama on May 7, 2022, and that on October 8, 2020, Scott Thomas McArdle was added as a signatory at Community Bank located at 813 Shades Creek Parkway, Birmingham, Alabama.

5.     Hereinafter "Defendants" have been seized and are in the custody of the United States.

## BASIS FOR FORFEITURE

6.     Defendants are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981 because they constitute property involved in a conspiracy to commit wire fraud, wire fraud and healthcare fraud transactions, proceeds and/or property traceable to a wire fraud conspiracy and wire fraud and healthcare fraud in violation of 18 U.S.C. §§ 1343, 1347 and 1349.

7.      Defendants are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981 because they constitute property involved in a conspiracy to commit money laundering and money laundering transactions, proceeds of money laundering transactions and/or property traceable to money laundering transactions in violation of 18 U.S.C. §§ 1956(h), 1956 and/or 1957.

8.      Defendants are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981 because they constitute property used or involved in a violation of 18 U.S.C. § 1344.

## FACTS

9.      Specific details of the facts and circumstances supporting the forfeiture of the Defendants have been provided by Federal Bureau of Investigation ("FBI") Special Agent Justin Lowrance and are contained in Exhibit A which is attached hereto and incorporated by reference.

## CONCLUSION

10.      As required by Supp'l Rule G(2)(f), the facts set forth herein support a reasonable belief that the United States will be able to meet its burden of proof at trial. Specifically, probable cause exists to believe that the Defendants constitute proceeds or are traceable to proceeds of federal wire fraud, bank fraud and money laundering statutes and are therefore subject to forfeiture pursuant to 18 U.S.C. § 981.

WHEREFORE, pursuant to Supp'l Rule G, Plaintiff United States of America respectfully requests that process of forfeiture be issued against the Defendants; that due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed; that the Defendants be forfeited to the United States for disposition according to law; and that the United States have such other and further relief as this case may require.

Respectfully submitted,

SEAN P. COSTELLO
UNITED STATES ATTORNEY


Date: August 4, 2023                    By:    */s/ Gina S. Vann*
                                               Gina S. Vann
                                               Assistant United States Attorney
                                               63 S. Royal Street, Suite 600
                                               Mobile, Alabama 36602
                                               Telephone: (251) 441-5845
                                               gina.vann@usdoj.gov

## **VERIFICATION**

I, Special Agent, Justin Lowrance, hereby declare and verify the following:

I am a Special Agent with the Federal Bureau of Investigation (FBI). I have been employed in that capacity for approximately 12 years. I am presently assigned to the Mobile Resident Office, Mobile, Alabama. I have undergone extensive training in connection with my employment for the investigation of health care fraud, financial crimes, and other related offenses. I have led, supervised and/or participated in several complex investigations concerning healthcare fraud and financial crimes.  Through my training and experience, I have become familiar with the manner and means that fraudsters use to conceal their illegal transactions and proceeds from detection by law enforcement, including but not limited to the use of business bank accounts.

I am familiar with the aspects of this investigation as described in the Facts section (Exhibit A) above. The statements contained therein are based upon my knowledge and information provided by other law enforcement officers involved in this investigation. The Facts section of this Complaint does not contain all the facts that I have learned during the investigation.

I have read the foregoing Facts section of this Verified Complaint *in rem*, and know the contents thereof. Pursuant to 28 U.S.C. § 1746, I hereby verify and declare under penalty of perjury that the Facts section and this verification are true and correct to the best of my knowledge, information, and belief.

Executed this __/__ day of August 2023.

_____
Justin Lowrance, Special Agent

6

# EXHIBIT A

# FACTS

## BACKGROUND

1.      Justin Lowrance is a Special Agent with the FBI and has been so employed since March

2011. He is currently assigned to the White-Collar Unit within the Mobile, Alabama field office.

He has been in this position since April 2021. Prior to that, he was an FBI Special Agent in

Oklahoma, an FBI Supervisory Special Agent in South Dakota, and before joining the FBI, a

police officer in Indiana. His current duties include investigating violations of federal law,

including both healthcare fraud and financial crimes. He has received training on obtaining and

reviewing electronic records, including bank records, and routinely does so as part of his

investigations. SA Lowrance applied for and obtained seizure warrants for the contents of the

following three bank accounts:

a. Community Bank account number xxxx8834 held in the name of Gulf Coast

Molecular Laboratories, LLC.  The amount seized from the account was  $789,936.10

(hereinafter "Defendant #3");

b. Renasant Bank account number xxxx2094 held in the name of TeleMD, LLC.  The

amount seized was $2,965,970.85 (hereinafter "Defendant #2 ");

c. Morgan Stanley account number xxxx7097 held in the name of Gulf Coast Molecular

Laboratories, LLC. The amount seized from the account was $5,524,745.33 (hereinafter

"Defendant #1").

1

2.      The basis of the seizure warrants was that there was probable cause to believe that the

individuals discussed below committed wire fraud and healthcare fraud in violation of Title 18,

United States Code, Section 1343 and 1347. There is also evidence that there was conspiracy to

commit wire fraud in violation of  Title 18, United States Code, Section 1349 and various money

laundering crimes in violation of Title 18, United States Code, Sections 1956, 1956(h) and 1957.

In addition, there is probable cause to believe that funds in Defendant #3's account, the funds in

Defendant #2's account and the funds in Defendant #1's account constitute and are derived from

proceeds traceable to these offenses. Accordingly, these funds are subject to criminal and civil

forfeiture for the reasons explained below. SA Lowrance has not set forth all facts known to him

concerning this investigation. This complaint is based on his direct involvement in this

investigation, discussions with a Health & Human Services – Office of Inspector General

("HHS–OIG") agent who is also directly involved in this investigation, reviews of financial and

Medicare records, and interviews conducted with individuals associated with the healthcare and

wire fraud schemes and money laundering set out below.

**FACTS SUPPORTING SEIZURE WARRANTS**

**GULF COAST MOLECULAR LABS**

3.      According to the Alabama Secretary of State website, Gulf Coast Molecular Laboratories,

LLC (hereinafter "GCML") was incorporated in June 2018 by James Matthew "Bo" Thornton

Potter, age 48 of Santa Rosa Beach, Florida and James Thomas McArdle, Jr., age 75, of

Birmingham, Alabama. GCML is located in a strip mall in Spanish Fort, Alabama, which is

within the Southern District of Alabama.

2

4.      Since December 2018, GCML has been a registered provider with Medicare. As a Medicare provider, GCML can bill for reasonable and necessary medical laboratory tests. In addition, as will be explained below, GCML had the ability to bill for certain COVID-19 test kits. Reimbursement monies for claims submitted to Medicare by GCML are paid to GCML via electronic wire transfers deposited into Defendant #3's account, which is located in the Southern District of Alabama.

**BACKGROUND ON MEDICARE PROGRAM**

5.      Medicare is a federal health benefits program administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency of the U.S. Department of Health and Human Services. Medicare is funded through individual payroll taxes, other taxes, and user fees. Medicare helps pay for the reasonable and necessary medical services for people aged 65 and over and some persons under 65 with specific illnesses and/or disabilities. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

6.      Each Medicare beneficiary is identified with a unique beneficiary identifier number ("BIN"). These BINs are used, among other ways, to determine a beneficiary's eligibility for Medicare benefits, and to submit claims to Medicare seeking reimbursement for covered benefits, items, and services. BINs are considered means of identification pursuant to Title 18 U.S.C. § 1028(d)(7).

7.      Medicare is a "health care benefit program" as defined in Title 18 U.S.C. § 24(b). Thus, it is a "public . . . contract, affecting commerce, under which any medical benefit, item, or service is provided to an individual . . . ." *Id.*

3

8.      Medical providers and suppliers must obtain a National Provider Identifier ("NPI")

number before enrolling in Medicare. Health care providers seeking to become Medicare

providers must submit enrollment documentation to Medicare, which includes, among other

things, contact information for the provider.

9.      Every claim submitted by, or on behalf of, a healthcare provider, includes an agreement

by the provider to abide by Medicare's rules and regulations. As a condition of payment,

Medicare requires providers to certify all information on the claim is true, correct, and complete.

10.     Health care providers, like GCML, are paid by Medicare through the submission of

claims. All Medicare providers are required to submit claims electronically. These claims are

processed through a facility in Baltimore, Maryland and thus, claims electronically submitted by

GCML in the Southern District of Alabama travel in interstate commerce.

11.     Payments for claims are deposited into the provider's bank account via electronic fund

transfers. In this case, Medicare payments for claims filed by GCML were paid into Defendant

#3's account.

**OVER THE COUNTER ("OTC") COVID-19 TEST KITS**

12.     In April 2022, the federal government announced that Medicare beneficiaries could

receive up to eight OTC COVID-19 tests per calendar month — at no cost to the beneficiary —

from participating pharmacies and healthcare providers during the duration of the COVID-19

public health emergency ("PHE").

13.     While these tests were available at no cost to beneficiaries, they were not "free." Rather, Medicare used federal tax dollars to reimburse healthcare providers for these tests at the tune of approximately $94.08 per test.

14.     During the period where these no-cost COVID test kits were authorized for distribution, participating healthcare providers were encouraged by Medicare to use online ordering mechanisms, including direct-to-consumer shipping programs, to furnish these tests to beneficiaries. Direct-to-consumer shipping programs included online or telephone ordering. However, to comply with the federal authorization for these tests, these direct-to-consumer shipping programs could only be operated by an eligible pharmacy or healthcare provider participating in the Medicare program.

15.     The federal government ended the PHE on May 11, 2023. Accordingly, Medicare will no longer pay for the no-cost COVID-19 test kits for beneficiaries. However, Medicare announced a one-year grace period for healthcare providers to bill for these tests shipped to beneficiaries prior to May 11, 2023, but which had not been billed to Medicare before the date the PHE ended.

16.     To receive reimbursement from Medicare for these COVID-19 tests, healthcare providers like GCML were directed to bill Medicare using Healthcare Common Procedure Coding System ("HCPCS") code K1034. CMS's guidance to providers billing for these tests was to "only give patients the tests when they request them." Thus, a provider like GCML could not send unrequested tests to beneficiaries and then bill for these tests. In addition, CMS instructed providers to "keep good documentation. We may ask to see documentation showing a patient's

request for tests. If you don't provide the documentation, we could recoup payment and may take other administrative actions." *See* https://www.cms.gov/COVIDOTCtestsProvider.

**EVIDENCE IN SUPPORT OF PROBABLE CAUSE**
**FOR SEIZURE OF FUNDS IN DEFENDANTS' ACCOUNTS**

17.    Since late April 2023, the FBI and HHS-OIG have investigated allegations that GCML has, from approximately February 1, 2023, through the date of this affidavit, fraudulently obtained government funds from Medicare by submitting claims for COVID-19 test kits that beneficiaries never requested. Claims were submitted by GCML to Medicare via interstate wire, and Medicare reimbursed these claims by interstate electronic funds transfers, which were deposited into Defendant #3's account. In addition, from approximately February 2, 2023, through the present, GCML has wired from Defendant's #3's account into Defendant #2's account approximately 46% of the funds received from Medicare for COVID test reimbursement claims filed by GCML.

18.    Funds up to $7,411,504.52 in Defendant #3's account and funds up to $6,410,000.00 in Defendant #2's account are proceeds traceable to wire and healthcare fraud offenses. Therefore, these funds are subject to forfeiture.

**OVERVIEW OF INVESTIGATION INTO GCML**

19.    HHS–OIG Special Agents and other fraud investigators contracted with Medicare routinely analyze Medicare billing data to identify anomalies that might be warning signs of healthcare fraud. In April 2023, these investigators identified serious anomalies related to GCML's billing of Code K1034 — the billing code for OTC COVID-19 test kits. In addition to

statistical billing anomalies, HHS–OIG and CMS began receiving thousands of complaints from beneficiaries across the United States claiming their Medicare accounts were billed by GCML without receiving any COVID-19 test kit or claiming they received unrequested tests billed to Medicare by GCML. These developments led both FBI–Mobile and HHS–OIG to open a joint criminal investigation into GCML.

20.    The joint FBI/HHS–OIG investigation (hereinafter "the investigation") revealed an exceptional spike in GCML's billing for Medicare services in 2023. During 2022, GCML billed Medicare for zero COVID-19 test kits despite the federal authorization for providing these "no-cost" tests being in place since April 2022. However, in the first quarter of 2023, GCML billed Medicare for 57,335 COVID-19 test kits. This number increased to 99,580 claims during the second quarter of 2023. Thus, in the *first half* of 2023, GCML billed Medicare for 156,915 COVID-19 test using code K1034 whereas they billed for zero such tests in *all* of 2022.

21.    During the first two quarters of 2023, Medicare reimbursed GCML a total of $13,821,504.52 for the code K1034 claims. For *all other claims combined* during this same period, Medicare only reimbursed GCML a total of $104,499.96. Thus, approximately 99.2% of all money paid by Medicare to GCML during the first half of 2023 was directly associated to code K1034 claims for COVID-19 test kits.

22.    The $13,821,504.52 paid by Medicare to GCML was as reimbursement for 156,915 COVID-19 test kit claims. Of note, at least 591 of these claims were filed on behalf of beneficiaries who were already deceased.

7

23.     In addition to these statistics, the Benefits Integrity Unit ("BIU"), which handles

Medicare complaints lodged by beneficiaries, has seen a massive spike in complaints about

GCML. Since March 8, 2023, approximately 4,315 beneficiaries have filed complaints against

GCML with BIU. These complaints all relate to receiving unrequested COVID-19 tests from

GCML or being billed by GCML for services not rendered, *i.e.*, the beneficiary's BIN was billed

for a test, but no test was ever received by the beneficiary. At least 96 similar complaints against

GCML have also been called into the HHS-OIG phone hotline during this same period.

24.     The large number of beneficiary complaints filed with BIU in such a small period is

notable for two reasons: First, this number only reflects beneficiaries who actually took the time

to contact BIU and file a formal complaint. Second, the 4,315 complaints made about GCML

during the first half of 2023 stands in stark contrast to *zero* complaints filed about GCML in

2022.

25.     Based on evidence uncovered so far, it appears GCML obtained lists of BINs and used

beneficiaries' personal information to bill for or to send unrequested COVID-19 tests to over

140,000 beneficiaries — including to nearly 600 deceased beneficiaries. Thereafter, GCML

billed Medicare for these unrequested tests and received the money from Medicare into

Defendant #3's account.

26.     While the investigation has not revealed how or from whom GCML received these BINs,

there is a direct connection with GCML's actions and a criminal healthcare fraud case in the

Southern District of Florida.

27.     In September 2022, Charles William McElwee was indicted for unlawfully distributing

BINs associated with approximately 2.6 million Medicare beneficiaries. *See United States v.*

*McElwee*, 22-cr-60202 (S.D. Fla. 2022). McElwee has been convicted and sentenced to 41

months in prison. Of the 142,323 beneficiaries for whom GCML has billed Medicare for

COVID-19 tests during the first half of 2023, 48,263 of these beneficiaries — or approximately

one-third — are amongst the beneficiaries whose BIN McElwee illegally distributed as part of his

criminal scheme in the Southern District of Florida.

**WIRE TRANSFERS FROM DEFENDANT #3's ACCOUNT TO DEFENDANT #2's ACCOUNT**

28.     The connection between the BIN used by GCML and the McElwee criminal case is not

the only connection with the Southern District of Florida discovered during this investigation.

29.     In 1991, Brian Cotugno was convicted in the Southern District of Florida of possessing

with the intent to distribute cocaine and was sentenced to 121 months in federal prison. Cotugno

now resides in Georgia and owns TeleMD, LLC ("TeleMD").

30.     Defendant #2's account is held in the name of TeleMD and Cotugno is the sole signor on

that account.

31.     Cotugno is not a medical doctor. Neither he nor TeleMD is enrolled with Medicare.

Accordingly, neither Cotugno nor TeleMD can bill Medicare for items or services, such as the

provision of COVID-19 tests.

32.     Banking records obtained through this investigation have not revealed any financial

connection between GCML and TeleMD/Cotugno prior to February 2, 2023. However, at the

exact same time GCML started receiving millions of dollars in Medicare reimbursements for

COVID-19 test kits, GCML also started wiring millions of dollars from Defendant #3's account

to Defendant #2's account. The account balances as of January 31, 2023 — before the scheme

began — were:

> a. Defendant #3's account — $65,097.45; and
>
> b. Defendant #2's account — $40,494.52.

The only funds deposited into Defendant #3's account in sufficient amounts to cover the transfers

from Defendant #3's account to Defendant #2's account are directly traceable to Medicare

reimbursement payments associated with GCML's billing for COVID-19 tests. Accordingly, the

money deposited into Defendant #2's account from Defendant #3's account is directly traceable

to the proceeds of the wire fraud, healthcare fraud and money laundering offenses.

33.    The chart below shows all currently known wire transfers between Defendant #3's

account and Defendant #2's account:

| Date | Amount | Wired From | Wired To | Claimed Purpose of Wire |
|---|---|---|---|---|
| 02/02/23 | $120,000.00 | Acct Def #3 | Acct Def #2 | Marketing Services |
| 02/17/23 | $120,000.00 | Acct Def #3 | Acct Def #2 | Marketing Services |
| 02/28/23 | $120,000.00 | Acct Def #3 | Acct Def #2 | Contract Payment |
| 03/10/23 | $240,000.00 | Acct Def #3 | Acct Def #2 | Investment |
| 03/17/23 | $170,000.00 | Acct Def #3 | Acct Def #2 | Marketing Services |
| 03/24/23 | $60,000.00 | Acct Def #3 | Acct Def #2 | Marketing Services |

| | | | | |
|---|---|---|---|---|
| 03/27/23 | $70,000.00 | Acct Def #3 | Acct Def #2 | Marketing Services |
| 03/31/23 | $35,000.00 | Acct Def #3 | Acct Def #2 | Marketing Services |
| 04/06/23 | $500,000.00 | Acct Def #3 | Acct Def #2 | Marketing Services |
| 04/07/23 | $300,000.00 | Acct Def #3 | Acct Def #2 | Marketing Services |
| 04/11/23 | $300,000.00 | Acct Def #3 | Acct Def #2 | Marketing Services |
| 04/14/23 | $400,000.00 | Acct Def #3 | Acct Def #2 | Marketing Services |
| 04/20/23 | $500,000.00 | Acct Def #3 | Acct Def #2 | Marketing Services |
| 04/24/23 | $300,000.00 | Acct Def #3 | Acct Def #2 | Marketing Services |
| 04/27/23 | $300,000.00 | Acct Def #3 | Acct Def #2 | Marketing Services |
| 05/02/23 | $300,000.00 | Acct Def #3 | Acct Def #2 | Marketing Services |
| 05/04/23 | $275,000.00 | Acct Def #3 | Acct Def #2 | Marketing Services |
| 05/08/23 | $400,000.00 | Acct Def #3 | Acct Def #2 | Marketing Services |
| 05/12/23 | $500,000.00 | Acct Def #3 | Acct Def #2 | Marketing Services |
| 05/15/23 | $400,000.00 | Acct Def #3 | Acct Def #2 | Marketing Services |

| 05/18/23 | $500,000.00 | Acct Def #3 | Acct Def #2 | Marketing Services |
| 05/22/23 | $500,000.00 | Acct Def #3 | Acct Def #2 | Marketing Services |

34.     All of the $13,821,504.52 paid by Medicare for the COVID-19 tests billed by GCML during this period was deposited into Defendant #3's account. As can be seen in the chart above, GCML sent numerous wires totaling $6,410,000.00 from Defendant #3's account to Defendant #2's account during this same period. Thus, approximately 46% of the money Medicare deposited into Defendant #3's account as reimbursement for the COVID-19 test kits was transferred to Defendant #2's account. Defendant #3's account retained $7,411,504.52, or approximately 54%, of the money Medicare paid GCML for the COVID-19 tests.

35.     Bank account records obtained during this investigation show the following as the latest known balances of these accounts:

> a. Defendant #3's account — $6,462,026.18 (as of May 31, 2023); and
>
> b. Defendant #2's account — $3,377,676.14 (as of July 5, 2023).

36.     When serving the seizure warrant on Defendant #3's bank, SA Lowrance learned that $6,000,000 cash was transferred from Defendant #3's account into Defendant #1's account Therefore Defendant #1's account also contained that amount of illegal proceeds of the crimes.